Filed 1/9/20

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br>v.<br>DERRICK DAMON HARPER,<br>　　　Defendant and Appellant. | A152284<br><br>(Contra Costa County<br>Super. Ct. No. 05-152089-9) |

A jury found defendant Derrick Damon Harper guilty of conspiracy to commit human trafficking and multiple kidnapping and sex offenses. Harper contends his kidnapping and kidnapping-for-extortion convictions must be reversed because the conduct underlying the charges could be prosecuted only under the more specific statute Penal Code section 266a, which prohibits "tak[ing] any person against his or her will and without his or her consent . . . for the purpose of prostitution." This contention is based on a doctrine known as the "*Williamson* rule" after our Supreme Court's decision in *In re Williamson* (1954) 43 Cal.2d 651, 654 (*Williamson*), which held that if a general statute includes the same conduct as a special statute, courts infer that the Legislature intended the conduct to be prosecuted *only* under the special statute.

In the alternative, Harper argues his two convictions of kidnapping for extortion must be reversed, first, because his conduct did not constitute extortion and, second, because the jury instruction given, CALCRIM No. 1202, was an incorrect statement of law.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts D, E, F. G, and H of the Discussion.

1

In the published portion of our opinion, we hold that the *Williamson* rule does not bar the convictions here, that defendant's conduct constituted extortion, and that although the challenged jury instruction contained an incorrect statement, it did not contribute to the jury's verdict.

In the unpublished portion of the opinion, we find sufficient evidence of kidnapping to support counts 12 and 21; we agree with the parties that certain enhancements were improperly imposed and therefore strike those enhancements; and we remand the matter for resentencing under recently enacted legislation.

## FACTUAL AND PROCEDURAL BACKGROUND

*Charges*

The Contra Costa County District Attorney charged Harper, along with five codefendants (most notably, Roy Gordon and Eric Beman), with conspiracy to commit human trafficking (Pen. Code,[1] §§ 182, subd. (a)(1), 236.1, subd. (b); count 1) and other offenses related to alleged coercive pimping.[2]

---

[1] All undesignated statutory references are to the Penal Code.

[2] When Harper's case went to trial, the jury decided the conspiracy charge and the following additional charges: sodomy by use of force of Jane Doe 2 (§ 286, subd. (c)(2); count 9), two counts of kidnapping for extortion (a type of aggravated kidnapping) of Doe 2 (§ 209, subd. (a) (hereinafter § 209(a)); counts 10 and 12), four counts of forcible rape of Doe 2 (§ 261, subd. (a)(2); counts 13, 22, 23, and 24), human trafficking of Jane Doe 1 (§ 236.1, subd. (b); count 15), forcible oral copulation of Doe 1 (former § 288a, subd. (c)(2)(A), as amended by Stats. 2010, ch. 219, § 8; count 16), and two counts of kidnapping Doe 2 (§ 207; counts 20 and 21).

As to count 13 (forcible rape), it was alleged as aggravating circumstances that Harper kidnapped Doe 2, and the movement of Doe 2 substantially increased the risk of harm over and above the level of risk necessarily inherent in the crime. (§ 667.61, subd. (d)(2).) As to counts 12 (kidnapping for extortion) and 21 (kidnapping), it was alleged that Harper personally used a firearm within the meaning of section 12022.53, subdivision (b). Additional allegations that Harper suffered prior felony convictions were subsequently tried by the court.

*Trial*

<u>Jane Doe 2</u>

In 2007, Doe 2 was 18 years old and "in an active addiction to meth."[3]  She did not have stable housing and "was back and forth between Pittsburg, Antioch, Brentwood, [and] Oakley."  During this period, Doe 2 lived with Jeff Fowler for a few months.

One day, Fowler took Doe 2 to an apartment in Pittsburg where he wanted her to perform oral sex on a man (implicitly for money).  At the apartment, Doe 2 went to a back room and had sex with codefendant Roy Gordon.  Afterward, Doe 2 realized Fowler had left the apartment, and she felt scared.

Gordon told Doe 2 he would take her back to Fowler, but instead he took her to a house on Dover in Pittsburg.  Gordon showed Doe 2 a bedroom and told her she would be staying there.  He told Doe 2 she was going to work for him, and she felt like she couldn't leave.  Doe 2 performed three acts of prostitution during the time she was at the Dover house, and Gordon supplied her with methamphetamine.

At some point, four girls beat up Doe 2 and cut off her hair.  Gordon took Doe 2 to a second house to recover from the beating.  After two or three days, Doe 2 left the second house.  Doe 2 testified she stayed at the Dover house for about three or four weeks.

In 2009, Doe 2 met Harper at the apartment of a woman named Candace.  Harper brought methamphetamine to the apartment, Doe 2 got high with Candace and another woman, and Doe 2 had consensual sex with Harper.

A few months later, Harper offered Doe 2 a place to stay in a foreclosed house on DiMaggio.  Doe 2 went to the DiMaggio house.  Initially, Doe 2 felt like she was free to come and go at the DiMaggio house.  But then she saw Harper "jump" Nick Chavez, and she did not feel safe.[4]

---

[3] Doe 2 testified that she regularly smoked methamphetamine and marijuana.

[4] In this incident, Doe 2 observed Harper and men she knew as "Rude Boy" and "Chop" beat Chavez up.  They kicked Chavez and left him on the ground and drove

3

Doe 2 recalled riding in Harper's car when he saw a woman coming out of a building. (This woman was later identified at trial as Jane Doe 5.) Harper got out of the car and grabbed Doe 5 by the back of the neck and put her in the backseat of his car. He said Doe 5 owed him money, and she looked really scared. Harper took Doe 5 to the DiMaggio house, and he had Doe 5 sign a "contract" indicating she owed Harper money. Doe 2 was supposed to watch Doe 5, but she let Doe 5 escape through her bedroom window.

A few days after Doe 5 escaped, Harper called Doe 2 to the living room. He had Doe 2 take off her clothes and had another woman cut her hair off while he recorded the event on his phone.

*Aiding and Abetting Forcible Rape (Counts 22–24)*

Harper displayed a gun and had three men—Chavez, Rude Boy, and a man called "Ghost"—rape Doe 2. Harper had them go into a back room and rape her one by one. Harper would come in and make sure they were raping her and then he would close the door.

*Forcible Sodomy (Count 9)*

After the men raped Doe 2, Harper told her to take a shower. He told Doe 2 to go to her bedroom, and he anally raped her.

The next day, Harper dropped Doe 2 off with codefendant Eric Beman.[5] Harper told her "a hard head makes a soft ass," and Doe 2 understood this to mean if she "acted up" or didn't follow directions, she would be sodomized again or Beman would beat her.

---

away. This event "put some fear" in Doe 2 because she saw Harper "had influence like that over other people to just get them to beat somebody up with him."

[5] Previously, Doe 2 met Beman at a friend's apartment, and they got high and had consensual sex. Beman had given Doe 2 a ride to the DiMaggio house before the rapes occurred.

*Kidnapping for Extortion (Count 10), Kidnapping (Count 20), and Rape with Kidnapping (Count 13)*

Around 2009, Doe 2 was in custody for three or four months for receiving stolen property. After she got out of custody, Doe 2 stayed with her uncle in Oakley. She believed Harper was looking for her because she heard he was offering people she knew drugs and money to tell him where she was. As a result, Doe 2 "was always watching over [her] shoulder"; she carried a knife, did not go out on the streets during the day, and was very careful about who she socialized with.

Doe 2 was walking down the street at night in Antioch when Harper pulled up in a white pickup truck. He grabbed Doe 2 and put something hard to her back. He told her to get in the truck, and she complied. She saw that he had a gun. Harper took Doe 2 to a house on Jack London in Pittsburg. He had her take a shower, and then he raped her. He had a gun on the nightstand. The next day, Doe 2 looked at the gun while Harper was taking a shower. She determined the gun was not operational because when she picked it up, it rattled.

Doe 2 stayed at the Jack London house only a couple of days. Harper told her he was going to sell her to a man in Vallejo for $10,000, and this motivated Doe 2 to try to escape. She jumped over the back fence, ran a few streets away, and then called a friend to pick her up.

Around this time, Doe 2 was hanging out with the CoCo County Boys, a White criminal street gang.[6] She felt they would protect her from Harper to some extent.

*Kidnapping for Extortion (Count 12) and Kidnapping (Count 21)*

On another occasion, Doe 2 was getting high at a drug house on Peppertree Court in Antioch when Harper showed up. Doe 2 went with Harper because, she testified, "I didn't feel safe there and I didn't feel like anybody would even try to protect me there. So I didn't want anybody getting hurt."

---

[6] An expert witness testified the gang was also called "Peckerwood" or "Wood" for short.

Harper had Doe 2 dress in a skimpy skirt and heels. He mentioned again that he was going to sell her to a man in Vallejo. Harper and Chop drove Doe 2 to perform an act of prostitution. The client gave Chop $100, and Chop gave the money to Harper. Harper saw that the bill was fake. He drove to a gas station and asked Doe 2 to get change for the counterfeit bill from someone at the gas station. Doe 2 asked a man if he had change for a $100. The man recognized her, and Doe 2 realized she knew him; his name was Johnny. Doe 2 told Johnny that Harper was trying to sell her to a man in Vallejo and asked if he could help. Johnny told her to jump in, and she jumped in the back of his Bronco and covered herself with a towel.

Doe 2 testified there were six other times Harper attempted to kidnap her.

Jane Doe 1

Around 2006, Doe 1 was working as a prostitute. At some point, she moved in with Gordon in a house on Abbott.[7]

Beman was Gordon's best friend. Occasionally, Gordon would get arrested, and Beman would monitor Doe 1 while Gordon was in custody. In 2010, Gordon was in custody on a robbery charge. Doe 1 continued to work as a prostitute and lived with a woman named Shannon.

Doe 1 met Harper through Shannon, and he invited her to live with him rent free. Doe 1 moved into Harper's house on Jack London. At first, Doe 1 was free to come and go as she wanted.

At some point (while Gordon was in custody), Beman told Doe 1 she had no business being at Harper's house. Doe 1 told Harper what Beman said, and Harper said he was going to settle it with Beman. Doe 1 and Harper met Beman at a house in Antioch, and Harper and Beman had a heated discussion. Beman hit Doe 1 over the head

---

[7] Doe 1 corroborated parts of Doe 2's testimony to some extent. Doe 1 testified that she and Gordon moved to a house on Dover and, at some point, Doe 2 came to the house and worked as a prostitute. Doe 1 also recalled seeing Doe 2 with a shaved head at least once.

with a bottle, punched her, and "stomped" her while Harper watched. Doe 1 tried to leave with Harper, but Harper left without her.

Later, Harper told Doe 1 this was intended as a trade of sorts: Harper was supposed to take Doe 1 to Beman, and Beman "was supposed to give up . . . Doe 2" to Harper.

### Human Trafficking (Count 15)

Soon after Harper left Doe 1 with Beman in Antioch, Beman went to jail, and Doe 1 returned to Harper's house in Pittsburg. Harper made comments about making Doe 1 "his bitch," but she thought he was joking. One day, however, she packed her things to leave, and Harper said she was not going anywhere and "I told you I was going to make you my bitch."

After that, Doe 1 was forced to stay at the Jack London house, and she gave all the money she made from prostitution to Harper. Harper became physical with Doe 1 and hit her a lot. He told her if she ever left, he would go after her son. Harper agreed to a contract to allow Doe 1 to buy her freedom for $3,000, but when she gave him the money, he denied there was a contract.

### Oral Copulation (Count 16)

A couple of times after he beat Doe 1, Harper "would say, [']okay, Come suck my dick[']," which Doe 1 understood to mean the beating was over. Doe 1 agreed that she "d[id] that voluntarily," but only because she was scared after having been beaten up.

Other Prosecution Evidence

Around 2011, Alicia Hammond met Harper on the street in Antioch. She went with him to a house on Jack London and then to a bar in Antioch. Hammond left the bar by herself and waited outside for a friend to pick her up. As she was waiting outside, Harper drove up in a gold Lexus with a woman named Candace and another woman in the car. Harper had a gun on his lap and he told Hammond, "Get in the fucking car." Hammond got in his car because she was afraid she would be hurt or killed if she did not comply. Harper took her and the other women to a Denny's restaurant. He told

Hammond if she did not go with him, she would have to deal with Beman.  Harper and the women left, and Hammond had a friend pick her up from the restaurant.

Casey Beck knew Harper "from the streets outside."  Around 2010 or 2011, Harper told Beck that Doe 2 owed him money and had run away from him.  He offered Beck $100 and an eight ball of methamphetamine to find her.  Later, Beck saw Doe 2 at a friend's house.  Doe 2 told Beck that she was raped, fed drugs, and beaten up a few times at Harper's house.  Doe 2 said Harper was trying to force her to prostitute for him.

Jane Doe 5 testified that she met Harper in Antioch around 2008 at a house on DiMaggio.  Doe 2 was at the house.  Harper held a gun to Doe 5's head and made her perform oral sex on him.  Then Rude Boy and a teenager called "Hog" watched Doe 5 and made her stay in a room.[8]  Doe 5 was told she owed Harper $300, but she had never met him before.  After a couple of days, Doe 5 was allowed to leave the DiMaggio house when she said she was going to meet a client for sex.  About five days later, Harper raped Doe 5 in a house in Pittsburg.  A girl cut Doe 5's hair, and Harper videotaped it.

Defense

Harper testified on his own behalf.  He admitted he had been convicted in 1998 of two counts of kidnapping.  After he was released from custody, he lived in Pittsburg with his parents.  It was stipulated that Harper was in custody again from August 2008 to May 2009.  After he was released in 2009, he returned to his parents' house, worked as a security guard at a bar in Brentwood, briefly lived with a girlfriend in Antioch, and then moved back with his parents in 2010.

Harper testified he met Doe 2 in 2010 at Candace's apartment, and he and Doe 2 had sex in the bathroom.  He ran into her later and told her about a house available for rent on DiMaggio; Doe 2 and Candace ended up moving into the house.  Harper never lived in the DiMaggio house, but he visited often to see Candace.  According to Harper, Doe 2 was interested in a relationship with him, and they started dating.  Harper testified that, one day, he went to the DiMaggio house on his lunch break and saw Doe 2 having

---

[8] Another witness testified Chavez went by the nickname Hog.

8

sex with his friend Nick Chavez and two other men, "Ghost and Kaze." Harper testified he felt "disrespected, played" and he broke up with Doe 2. He denied he told the men to have sex with Doe 2. Harper admitted he yelled at Doe 2 when he saw her in front of the DiMaggio house talking to Beman.

Harper was in custody for a short period in 2011. After he was released, he lived in a house on Jack London with Candace. He met Doe 1 at the Jack London house, and he let her move in. Harper testified he had a list of white women who were being forced to prostitute themselves for Gordon and Beman, whom he described as his "enemies." Doe 1 was on this list. At some point, Harper began a sexual relationship with Doe 1.

Harper denied he had an agreement with Gordon or Beman to pimp women. He denied pimping Doe 1 or Doe 2. He denied raping or sodomizing Doe 2 and denied ever forcing Doe 2 to stay at his house. He denied ever asking anyone to cut Doe 2's hair. He denied ever forcing Doe 2 into a truck at gunpoint and denied taking her to the Jack London house. He denied telling Doe 2 he was going to sell her for $10,000. He denied forcing Doe 1 to perform oral sex on him. He denied kidnapping Doe 5.

*Jury Verdict*

The jury found Harper guilty of all of the charged counts except count 16, forced oral copulation of Doe 1.

The jury found true the enhancement allegations that Harper used a firearm in the commission of the second count of kidnapping for extortion of Doe 2 (count 12) and that, in the commission of forcible rape (count 13), he kidnapped Doe 2 and the movement of Doe 2 substantially increased the risk of harm to Doe 2 over the risk inherent in the forcible rape.

*Court Trial on Prior Convictions and Sentence*

The district attorney alleged Harper suffered two prior felony convictions for kidnapping that qualified as strikes under section 667, subdivisions (d) and (e), and as serious felonies under section 667, subdivision (a)(1), and one of the prior convictions was a violent felony for which he served a prison term (§ 667.5, subd. (a)). The trial

9

court took judicial notice of a prior criminal case and found the allegations of prior felony convictions true.

The trial court ruled the two prior felony convictions for kidnapping were separate strikes and sentenced Harper under the Three Strikes law.

Harper received an indeterminate sentence of 287 years to life for counts 9 (sodomy of Doe 2), 10 (kidnapping for extortion of Doe 2), 12 (same), 13 (forcible rape with kidnapping of Doe 2), 15 (human trafficking of Doe 1), and 22 (forcible rape of Doe 2).[9] The trial court also imposed and stayed, pursuant to section 654, terms for counts 1, 20, 21, 23, and 24.

## DISCUSSION

A.    *The Williamson Rule*

"Under the *Williamson* rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted *exclusively* under the special statute." (*People v. Murphy* (2011) 52 Cal.4th 81, 86 (*Murphy*), italics added.) Harper contends his convictions of kidnapping in violation of section 207 (counts 20 and 21) and kidnapping for extortion in violation of section 209(a) (counts 10 and 12) must be reversed under the *Williamson* rule because the conduct underlying these convictions may be prosecuted *only* under section 266a, which makes it a crime to "take[] any person against his or her will and without his or her consent . . . for the purpose of prostitution." We reject this contention.

---

[9] The sentence was calculated as follows: for count 13 (forcible rape of Doe 2), 75 years to life (25 years to life tripled), plus 10 years (two consecutive 5-year terms for the prior serious felonies under section 667, subdivision (a)); for count 9 (sodomy of Doe 2), 25 years to life, plus 10 years for the two prior serious felonies; for count 10 (kidnapping for extortion of Doe 2), 25 years to life, plus 10 years for the two prior serious felonies; for count 12 (kidnapping for extortion of Doe 2), 25 years to life, plus 10 years for personal use of a firearm, plus another 10 years for the two prior serious felonies; for count 15 (human trafficking of Doe 1), 42 years to life (middle term of 14 years tripled), plus 10 years for the two prior serious felonies; for count 22 (forcible rape of Doe 2), 25 years to life, plus 10 years for the two prior serious felonies.

1.      The Rule and Its Application

In *Williamson*, the California Supreme Court explained: " 'It is the general rule that where the general statute standing alone would include the same matter as the special act, and thus conflict with it, the special act will be considered as an exception to the general statute whether it was passed before or after such general enactment. Where the special statute is later it will be regarded as an exception to or qualification of the prior general one; and where the general act is later the special statute will be considered as remaining an exception to its terms unless it is repealed in general words or by necessary implication.' " (*Williamson*, *supra*, 43 Cal.2d at p. 654, quoting *People v. Breyer* (1934) 139 Cal.App. 547, 550.)

In that case, defendant Williamson was convicted of conspiracy, under the general statute of conspiracy (§ 182), to commit the crime of contracting without a license in violation of Business and Professions Code section 7028. Williamson challenged his sentence, arguing his criminal conduct expressly had been designated a misdemeanor by the Business and Professions Code. (*Williamson*, *supra*, 43 Cal.2d at pp. 652–653.) Our high court agreed, concluding the Business and Professions Code statute dealt with "the specific crime of conspiring to violate certain licensing provisions of that code" and was clearly a "specific enactment" that barred prosecution under the general conspiracy statute. (*Id*. at p. 654.)

Our Supreme Court examined and applied the *Williamson* rule more recently in *Murphy*, *supra*, 52 Cal.4th 81. After defendant Murphy crashed her car into a hillside and later falsely reported the car had been stolen, she was convicted of (among other things) procuring or offering a false or forged instrument for filing or recording in violation of section 115, subdivision (a), a felony.[10] On appeal, Murphy argued her prosecution under section 115 was precluded by the more specific statute applicable to

_____

[10] This subdivision provides, "Every person who knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States, is guilty of a felony." (§ 115, subd. (a).)

11

her conduct, Vehicle Code section 10501, subdivision (a), which makes it "unlawful for any person to make or file a false or fraudulent report of theft of a vehicle required to be registered under this code with any law enforcement agency with intent to deceive" and which is a misdemeanor for a first offense. (*Id*. at pp. 85, 88.)[11]

The *Murphy* court explained the *Williamson* rule is " 'designed to ascertain and carry out legislative intent' " and, "[a]bsent some indication of legislative intent to the contrary, [it] applies when (1) 'each element of the general statute corresponds to an element on the face of the special statute' or (2) when 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.' " (*Murphy*, *supra*, 52 Cal.4th at p. 86.)

The court continued, "On the other hand, if the more general statute contains an element that is not contained in the special statute and that element would not commonly occur in the context of a violation of the special statute, we do not assume that the Legislature intended to preclude prosecution under the general statute. In such situations, because the general statute contemplates more culpable conduct, it is reasonable to infer that the Legislature intended to punish such conduct more severely. For example, in [*People v*.] *Watson* [(1981)] 30 Cal.3d 290 [(*Watson*)], the defendant was charged with second degree implied malice murder based on a fatal automobile collision that occurred when the defendant was intoxicated and had been driving at excessive speeds. On appeal, the defendant argued that he could be convicted only of vehicular manslaughter under Penal Code section 192 because that statute specifically addressed killing while driving a vehicle, whereas the murder statute was a more general statute that addressed a broad range of unlawful killings. We rejected that argument because a murder conviction requires a finding of malice, while vehicular manslaughter requires only gross negligence. Because of the different mental state required, 'a violation of the vehicular

_____

[11] Murphy also argued Vehicle Code section 20 was a more specific statute applicable to her conduct, but the court did not reach this argument because it concluded Vehicle Code section 10501 precluded Murphy's conviction. (*Murphy*, *supra*, 52 Cal.4th at pp. 85, 95, fn. 4.)

12

manslaughter statute would not necessarily or commonly result in a violation of the general murder statute. Thus, the *Williamson* rule is inapplicable.' (*Watson*, *supra*, at p. 296.)" (*Murphy*, *supra*, 52 Cal.4th at p. 87.)

Applying the *Williamson* rule to Murphy's case, the court concluded Murphy's conviction had to be reversed. (*Murphy*, *supra*, 52 Cal.4th at p.95.) The court found Murphy's conduct plainly came within the terms of Vehicle Code section 10501, section 115 was more general than Vehicle Code section 10501 because it applied to a broader range of documents, and "[e]ach element of section 10501 has a counterpart in section 115." (*Id*. at pp. 88.) Finally, the court determined, "the filing of a false vehicle theft report would *commonly* violate Penal Code section 115." (*Id*. at p. 94.) Accordingly, the court inferred "that the Legislature, in specifying that such conduct constitutes a misdemeanor, intended to create an exception to the felony punishment specified in the more general statute." (*Id*. at pp. 94–95.)

### 2. Analysis

Harper claims his two convictions of kidnapping for extortion of Doe 2 in violation of section 209(a) (counts 10 and 12) and his two convictions of kidnapping of Doe 2 in violation of section 207 (counts 20 and 21) must be reversed under the *Williamson* rule because section 266a is the specific statute intended to cover the conduct underlying those convictions. In other words, Harper argues, his criminal conduct of grabbing Doe 2 off the street in Antioch and taking her to the Jack London house with the intent to obtain money from her by forcing her to work as a prostitute and, on another occasion, taking Doe 2 from a drug house in Antioch and dressing her in a skimpy skirt and heels for an act of prostitution could be prosecuted only under section 266a. We are not persuaded.[12]

---

[12] Preliminarily, the Attorney General argues Harper's *Williamson* rule claim has been forfeited because he failed to file a motion to dismiss on this ground. Harper responds that this court should decide the issue because it involves a pure question of law on undisputed facts and because his claim of a *Williamson* rule violation in this case resulted in an unauthorized sentence. In *People v. Henry* (2018) 28 Cal.App.5th 786, the defendant offered the same reasons to consider his *Williamson* challenge raised for the

a.    *Section 266a*

Section 266a provides in full, "Each person who, within this state, takes any person against his or her will and without his or her consent, or with his or her consent procured by fraudulent inducement or misrepresentation, for the purpose of prostitution, as defined in subdivision (b) of Section 647, is punishable by imprisonment in the state prison, and a fine not exceeding ten thousand dollars ($10,000)."[13]  A violation of section 266a is punishable by 16 months, two years, or three years in prison.  (§ 18, subd. (a).)

*People v. Mandell* (1939) 35 Cal.App.2d 368 (*Mandell*) is the only published case we have found in which a person was charged with violation of section 266a and the appellate court discussed the statute.  There, the victim "was induced to go with the defendants to Isleton by a promise to secure a position for her at that place as a waitress," but when they arrived in Isleton, the defendants took the victim to "a house of ill-fame."  (*Id*. at p. 370.)  The victim "practiced prostitution" at the house for two days, and the victim "said she was kept there as a captive."  (*Id*. at pp. 370–371.)  The defendants received a portion of her earnings from the proprietor of the house.  Regarding section 266a, the court explained, "The offense may be committed in two ways, first, by taking a female person for prostitution purpose, *against her will*; secondly, by obtaining her consent by means of fraudulent inducement."[14]  (*Id*. at p. 372.)  The court did not have occasion to discuss what constitutes "for the purpose of prostitution" under section 266a.

---

first time on appeal, and the Court of Appeal believed it was appropriate to address the merits of the *Williamson* issue.  (*Id*. at p. 791, fn. 3.)  We agree with *Henry* and consider the merits of Harper's *Williamson* argument.

[13] Section 647, subdivision (b)(4), provides that " 'prostitution' includes any lewd act between persons for money or other consideration."

[14] When *Mandell* was decided, section 266a provided that it was a crime to take " 'any female person.' "  (*Mandell*, *supra*, 35 Cal.App.2d at p. 372.)  The statute now applies to the taking of "any person."  (§ 266a.)

14

b.    *Kidnapping in Violation of Section 207*

Section 207, subdivision (a), provides, "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping."  Kidnapping is punishable by imprisonment in state prison for three, five, or eight years.  (§ 208, subd. (a).)

"Generally, to prove the crime of kidnapping, the prosecution must prove three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance."[15]  (*People v. Jones* (2003) 108 Cal.App.4th 455, 462 (*Jones*).)  The third element is called the "asportation" element.  (*People v. Bell* (2009) 179 Cal.App.4th 428, 435.)  The defendant's purpose or motive is not generally an element of a kidnapping crime.  (*Jones*, *supra*, at p. 462.)

Harper concedes that section 266a does not meet the elements test of the *Williamson* rule.  It is plainly not the case that each element of section 207 (the purported general statute) corresponds to an element on the face of section 266a (the purported special statute).

Instead, Harper seems to rely on the second part of the *Williamson* test, that " 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.' "  (*Murphy*, *supra*, 52 Cal.4th at p. 86.)  His entire argument is as follows: "It does not matter that kidnapping includes an element of force or fear that a violation of section 266a does not because the *Williamson* test does not require that the elements of the general and special offenses be identical. The difference is not significant here because the act of taking a person against her will under section 266a presupposes the use of force or fear."  This argument is unconvincing.

_____

[15] Since 1999, the third element of simple kidnapping is that the movement of the victim is " ' "substantial in character" ' " under the totality of the circumstances.  (*People v. Martinez* (1999) 20 Cal.4th 225, 237 (*Martinez*) overruled on another point by *People v. Fontenot* (2019) 8 Cal.5th 57, 70; *People v. Johnson* (2015) 61 Cal.4th 734, 771.)

Even if we assume for the sake of argument that "tak[ing] any person against his or her will and without his or her consent" under section 266a requires the use of force or fear,[16] this assumption does not show that violating section 266a in this way " 'will necessarily or commonly result in' " a kidnapping in violation of section 207, subdivision (a).  (*Murphy*, *supra*, 52 Cal.4th at p. 86.)  This is because, as the Attorney General points out, kidnapping requires that the defendant's movement of the victim be substantial in character—the asportation element.  Section 266a has no similar asportation requirement.  A person could take a victim without consent and against the victim's will for the purpose of prostitution in violation of section 266a *without* moving the victim substantially.  Accordingly, a violation of section 266a will not necessarily or commonly result in a violation of section 207, and the *Williamson* rule does not bar Harper's prosecution for kidnapping.  (Cf. *Jones*, *supra*, 108 Cal.App.4th at pp. 463–464 [rejecting argument that the child abduction statute was a specific statute precluding a noncustodial parent's conviction of kidnapping because "a violation of the child abduction statute by a noncustodial parent will not necessarily result in a violation of the kidnapping statute"]; *People v. Vasquez* (1991) 226 Cal.App.3d 988, 993–994 [rejecting argument that abduction for defilement in violation of section 265 was a specific statute precluding a conviction of kidnapping because "a violation of the 'special' statute, section 265, does not necessarily or commonly result in a violation of the 'general' statute, section 207"].)

In his reply, Harper asserts for the first time, "Taking a victim for prostitution, like simple kidnapping, necessarily involves movement that is 'substantial.' "  Harper,

---

[16] As we have seen, a violation of section 266a "may be committed in two ways" (*Mandell, supra,* 35 Cal.App.2d at p. 372), first, by taking the victim "against his or her will and without his or her consent" for the purpose of prostitution or, second, taking the victim "with his or her consent procured by fraudulent inducement or misrepresentation" for the purpose of prostitution (§ 266a).  When the purported special statute can be violated in two ways, we apply the *Williamson* rule focusing on the way the defendant claims his conduct violated the statute.  (*Murphy*, *supra*, 52 Cal.4th at p. 91.)  Therefore, in this case, we focus on the first way of violating section 266a, taking the victim against his or her will and without his or her consent.

however, cites no authority for his assertion that section 266a necessarily requires movement of a substantial character, and we see no reason to import that element into the statute.[17]

Essentially, Harper's position is that we should interpret section 266a as requiring a violation of section 207 (i.e., the commission of a kidnapping) with the added element that the kidnapping be committed "for the purpose of prostitution." But section 266a uses neither the word "kidnapping" nor the word "carry," it does not specify that there must be "substantial" movement of the victim, and the statute does not otherwise refer to section 207. Further, kidnapping is punishable by imprisonment for three, five, or eight years, while a violation of section 266a is punishable for a term of 16 months, two years, or three years. Of course, a "common theme" of criminal statutes is "increased punishment for increased culpability." (*People v. Fuller* (1975) 53 Cal.App.3d 417, 421.) If, as Harper urges, a violation of section 266a (where the victim is taken without consent rather than by fraud) necessarily constitutes a kidnapping in violation of section 207 *plus* a criminal intent that the offense be committed for the purpose of prostitution, we would normally expect the punishment for section 266a to be greater, not lesser, than the punishment for kidnapping alone. But, under Harper's argument that the *Williamson* rule applies, we would have to conclude that the Legislature intended to punish the commission of a kidnapping more leniently solely because the perpetrator committed the

---

[17] We have seen that the kidnapping statute contains *three* distinct elements: (1) the use of physical force or fear, (2) movement of the victim without the victim's consent, and (3) movement of the victim is substantial in character. (*Jones*, *supra*, 108 Cal.App.4th at p. 462; *Martinez*, *supra*, 20 Cal.4th at p. 237) These three elements would appear to correspond to the language of section 207, subdivision (a), as follows: "forcibly, or by any other means of instilling fear" goes to the first element of force or fear, "steals or *takes*, or holds, detains, or arrests any person in this state" goes to the second element of moving the victim, and "*carries* the person into another country, state, or county, or into another part of the same county" goes to the third element of asportation. (Italics added.) Thus, it is the phrase "carries the person into" at least "another part of the same county" that signifies the movement is substantial in character. The word "takes" as used in the Penal Code does not, by itself, imply substantial movement as Harper claims.

kidnapping "for the purpose of prostitution." We think a more sensible interpretation of section 266a is that it does *not* require every element of kidnapping. Therefore, we reject Harper's argument that "takes" as used in section 266a necessarily requires movement of the victim of a substantial character.

c.      *Kidnapping for Extortion in Violation of Section 209(a)*

Section 209(a) provides in relevant part, "Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away another person by any means whatsoever with intent to hold or detain, or who holds or detains, that person for ransom, reward or *to commit extortion* or to exact from another person any money or valuable thing, or any person who aids or abets any such act, is guilty of a felony . . . ." (Italics added.)

Before 2018, section 518 defined extortion as "the obtaining of property from another, with his consent, or the obtaining of an official act of a public officer, *induced by a wrongful use of force or fear*, or under color of official right." (Former § 518, italics added, as amended by Stats.1939, ch. 601, ch. 1, p. 2017; see, e.g., *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 387, fn. 18 [quoting the language of former section 518].)[18] Section 518's definition of extortion applies to kidnapping for extortion under section 209(a). (*People v. Kozlowski* (2002) 96 Cal.App.4th 853, 864 (*Kozlowski*); 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012), Crimes Against the Person, § 302, p. 1139.)

A violation of section 209(a) in which "no . . . person suffers death or bodily harm," is punishable by "imprisonment in the state prison for life with the possibility of parole." (§ 209(a).)

In this case, the prosecution's theory for the kidnapping for extortion charges was that Harper seized and held Doe 2 with the intent to extort money from Doe 2, where the money was to be obtained by forced prostitution, that is, by inducing Doe 2 to work as a

---

[18] As we discuss in section B., below, section 518 was amended effective January 1, 2018. The former version of section 518 applies because Harper's criminal conduct all occurred prior to 2018.

prostitute "by a wrongful use of force or fear." (§ 518.) In her closing argument addressing the kidnapping for extortion counts, the prosecutor reminded the jury of Beck's testimony[19] and emphasized, "It's all about money through the *forced* prostitution." (Italics added.)

The elements of section 209(a) do not correspond to the elements of section 266a. So the question again is whether " 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.' " (*Murphy*, *supra*, 52 Cal.4th at p. 86.) Here, we acknowledge we have little guidance on what section 266a precisely requires and what a typical offense might look like; there are few cases that discuss the statute and no CALCRIM jury instruction on the offense. But for Harper's *Williamson* argument to prevail, we would have to interpret the phrase "for the purpose of prostitution" as used in section 266a to mean "for the purpose *of inducing the victim to commit acts of* prostitution *by wrongful use of force or fear with the further intent to take property obtained through the victim's forced prostitution*." Harper offers no authority for this interpretation of section 266a, and we decline to read the statute in that manner. Instead, we think section 266a could be violated by a person taking a victim without consent and against the victim's will for the purpose of prostitution *without* the person using force or fear to obtain property from the victim.[20]

---

[19] Beck testified that Harper was looking for Doe 2 because she owed him money and ran away from him, and that Harper offered him money and drugs for information on her location. Beck also testified that Doe 2 told him Harper was trying to force her to work as a prostitute for him.

[20] For example, a person could take a victim against the victim's will and commit an act of pandering against the victim in violation of section 266i (an offense which includes "[p]rocur[ing] another person *for the purpose of prostitution*" (italics added)). This conduct would constitute a violation of section 266a even though pandering does not require the use of force or violence (e.g., *People v. Almodovar* (1987) 190 Cal.App.3d 732, 746), does not require that the panderer receive money (*People v. Hashimoto* (1976) 54 Cal.App.3d 862, 866), and does not require that the panderer intend to procure the victim to engage in lewd acts with anyone other than the panderer himself (*People v. Jacobo* (2019) 37 Cal.App.5th 32, 45). We do not mean to imply that a violation of section 266a requires an act of pandering. (On the contrary, any act of solicitation in

19

Thus, we cannot say a violation of section 266a will necessarily or commonly result in a violation of section 209(a).

Since kidnapping for extortion in violation of section 209(a) contemplates more culpable conduct (the wrongful use of force or fear to obtain property) than is required for a violation of section 266a, "it is reasonable to infer that the Legislature intended to punish such conduct more severely." (*Murphy*, *supra*, 52 Cal.4th at p. 87.) The *Williamson* rule is, after all, a rule for inferring the Legislature's intention, and we find it difficult to believe the Legislature would have intended Harper's conduct underlying counts 10 and 12 to be prosecuted under section 266a to the exclusion of section 209(a). Accordingly, we reject Harper's challenge to his convictions of kidnapping for extortion under the *Williamson* rule.

B.    *Sufficiency of the Evidence of Kidnapping for Extortion*

Harper next argues insufficient evidence supports his convictions of counts 10 and 12 because the conduct relied on by the prosecution did not qualify as extortion under section 518.

Section 209(a) "describes four different types of aggravated kidnapping: (1) for ransom; (2) for reward; (3) to commit extortion; and (4) to exact from another person any money or valuable thing. The crime of extortion (Pen. Code, § 518) does not require that the fruits of the extortion be obtained from a third party." (*People v. Ibrahim* (1993) 19 Cal.App.4th 1692, 1696 (*Ibrahim*).) Only the fourth type of kidnapping in violation of section 209(a) ("to exact from another person any money or valuable thing") requires both a primary victim (the one who is seized) and a secondary victim (the one from whom money or a valuable thing is exacted). (*Ibid.*; *Kozlowski*, *supra*, 96 Cal.App.4th at p. 871.)

---

violation of section 647, subdivision (b)(2), would likely qualify as "for purpose of prostitution" under section 266a.) Our only point is to suggest there may be many ways to violate section 266a that do not amount to a violation of section 209(a).

20

The prosecution's theory of kidnapping for extortion was that Harper twice seized Doe 2 with the intent to obtain money from her through forced prostitution. On appeal, Harper concedes he kidnapped Doe 2 "for purposes of prostituting her," but he argues neither Doe 2's "body nor her sexual conduct" qualified as "property" under section 518 at the times Harper kidnapped Doe 2.[21] Harper relies on an amendment to section 518 that went into effect on January 1, 2018. The statute now provides that extortion "is the obtaining of property *or other consideration* from another . . ." and " 'consideration' means anything of value, including sexual conduct . . . or an image of an intimate body part . . . ." (§ 518, subds. (a) and (b), italics added.) Although he twice kidnapped Doe 2 to obtain "sexual conduct" from Doe 2, Harper argues these actions did not qualify as kidnapping for extortion before the 2018 amendment to the extortion statute.

The Attorney General responds, "[Harper] did not kidnap [Doe 2] to have sex with her (though he did that too) or even to have her engage in sexual conduct with others, but to obtain money by hiring her out as a prostitute. Money has always qualified as property for purposes of extortion. . . . The amendment to section 518 is directed to those who seek to obtain sexual conduct as their end goal; such conduct, in and of itself, does not constitute property, and thus did not previously qualify as an object of extortion. Here, however, Jane Doe 2's 'sexual conduct' was not the object of the extortion. The object of the extortion was the money [Doe 2] could earn by working as a prostitute; her sexual conduct was only an intermediate step necessary to acquire the money. This money was capable of being extorted within the meaning of section 209, subdivision (a) at the time of [Harper's] crime[s]." We agree with the Attorney General. The prosecution's theory was that Harper's purpose in kidnapping Doe 2 was to obtain money from her. As the prosecutor argued to the jury, "It's all about *money* through the forced prostitution."

---

[21] Again, at the relevant times, section 518 defined extortion as "the obtaining of property from another, with his consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force or fear, or under color of official right." (Former § 518.)

21

(Italics added.)  Using force or fear to obtain money from a victim with her consent qualified as extortion prior to the amendment to section 518.

We note that Harper does *not* claim there was insufficient evidence that he kidnapped Doe 2 to force her to work as a prostitute so he could obtain money.  To the contrary, he asserts he kidnapped her "to obtain prostitution services from Jane Doe 2." Because Harper ultimately wanted money from Doe 2's forced prostitution services, his conduct qualified as extortion prior to the amendment to section 518.[22]

C.     *The Jury Instruction on Kidnapping for Extortion*

Harper next contends his convictions of kidnapping for extortion (counts 10 and 12) must be reversed because CALCRIM No. 1202 is an incorrect statement of law.  The Attorney General claims Harper forfeited this contention.  But "the forfeiture rule 'does not apply when . . . the trial court gives an instruction that is an incorrect statement of the law.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 312 (*Gomez*).)  Since that is what Harper contends happened in this case, we address the merits of his contention.  (See *ibid*.)

1.     CALCRIM No. 1202

CALCRIM No. 1202 describes five elements of aggravating kidnapping in violation of section 209(a).  Harper argues the third element is incorrect.  After describing in the first two elements the conduct against a victim the defendant must commit, CALCRIM No. 1202 provides, "3.  The defendant did so (for ransom[,]/ [or] for reward[,]/ [or] to commit extortion[,]/ [or] to get money or something valuable."[23]

---

[22] We also note that Harper argues there was insufficient evidence to support the fourth type of aggravated kidnapping under section 209(a), "to exact from another person any money or valuable thing."  The Attorney General does not dispute this, but the fourth type of aggravated kidnapping was not alleged or argued by the prosecution.  This argument has no effect on the verdict.

[23] The first element is that the defendant kidnapped, abducted, seized, confined, concealed, carried away, inveigled, enticed, or decoyed another person; the second element is that defendant held or detained the other person, or intended to hold or detain that person; the fourth element is that the other person did not consent to being kidnapped, abducted, seized, confined, concealed, carried away, inveigled, enticed, or

22

This sentence corresponds to the four different types of aggravated kidnapping under section 209(a). The statutory language for the fourth type of aggravated kidnapping is "to exact *from another person* any money or valuable thing" (§ 209(a), italics added), which means there must be a primary kidnap victim and a secondary victim ("another person"). (*Ibrahim*, *supra*, 19 Cal.App.4th at p. 1696; *Kozlowski*, *supra*, 96 Cal.App.4th at p. 871.) CALCRIM No. 1202 omits the phrase "from another person."

Harper argues, "By omitting the requirement of a secondary victim, CALCRIM [No.] 1202 relieves the prosecution of its burden of proving the element that the kidnapper intended to use the kidnapping victim to exact some kind of consideration from a third party or secondary victim." We agree that CALCRIM No. 1202's description of the fourth type of aggravated kidnapping is incomplete, and we urge the Advisory Committee on Criminal Jury Instructions to consider adding language to the pattern instruction on the fourth type of aggravated kidnapping so that it is clear the defendant must act for the purpose of exacting money or something valuable *from another person*, that is, from a person other than the kidnap victim.

2.     Jury Instruction Given

The relevant issue on appeal, however, is whether the challenged instruction given to the jury was misleading to Harper's prejudice in the context of the instructions as whole and the arguments made at trial. (*Gomez*, *supra*, 6 Cal.5th at p. 313 [" ' "When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." ' "]); *People v. Young* (2005) 34 Cal.4th 1149, 1202 ["The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury"].)

---

decoyed; and the fifth element is that defendant did not actually and reasonably believe the other person so consented. (See CALCRIM No. 1202.)

Here, the trial court gave an adapted version of CALCRIM No. 1202 that began, "The defendant [is] charged in Counts Ten and Twelve with Kidnapping for Extortion *or Getting Money or Something Valuable* in violation of Penal Code section 209(a)" and provided, as relevant to Harper's argument: "To prove that the defendant is guilty of this crime, the People must prove beyond a reasonable doubt that: [¶] 1. The defendant kidnapped, abducted, seized, confined, concealed, or carried away Jane Doe #2 . . .; [¶] 2. The defendant held or detained Jane Doe #2 . . .; [¶] 3. The defendant did so to commit extortion *or to get money or something valuable . . . .*" (Italics added.)

The instruction also provided a definition of extortion: "Someone intends to commit *extortion* if he or she intends to: (1) obtain a person's property with the person's consent and (2) obtains the person's consent through the use of force or fear. When a person is charged with kidnapping for Extortion the crime is completed when the kidnapping or confinement was accomplished. It is not required that the People prove that the intended extortion was accomplished."

3.  Analysis

The problem with the challenged instruction is that it contained additional language, "or to get money or something valuable," which is supposed to be given when the prosecution relies on the fourth type of aggravated kidnapping, but the prosecution in this case did not allege or argue that Harper committed this type of aggravated kidnapping.

Harper argues the instruction had the effect of relieving the prosecution of its burden of proving each element of the charged offenses beyond a reasonable doubt. This claim is premised on the theory that the jury would have understood that it was being instructed on *two* alternative theories of liability for the aggravated kidnapping charges of counts 10 and 12, so that it could convict if it found Harper guilty of either kidnapping for extortion *or* kidnapping to exact from another person any money or valuable thing. The question is whether there is a reasonable likelihood the jury applied the instruction in this manner. (*Gomez*, *supra*, 6 Cal.5th at p. 313.)

24

Harper claims the jury only could have understood the sentence as describing two different theories of liability for aggravated kidnapping. The Attorney General maintains the jury most likely understood the phrase "or to get money or something valuable" as a partial explanation of extortion, not as an alternative theory of liability. We believe the Attorney General has the better argument.

First, the jury was never told that there are four different types of aggravated kidnapping, so the jury had no reason to think that more than one type of aggravated kidnapping might be applicable in the case. Second, the jury's understanding of the instruction would have been informed by the attorneys' arguments, and the prosecutor and the defense attorney in this case discussed only kidnapping for extortion in their closing arguments.[24]

Third, the word "or" has more than one meaning. Although "or" is used to indicate "an alternative between different or unlike things, states, or actions," the word "or" can also be used to indicate "the synonymous, equivalent, or substitutive character of two words or phrases," such as in the example "lessen or abate." (Webster's Third New Internat. Dict. (1961) p. 1585.) Considering the sentence in the context of the overall instructions and argument, the jury would have understood the initial "or" in the sentence "The defendant did so to commit extortion or to get money or something valuable" as indicating a synonymous, equivalent or substitutive phrase. That is, the jury would have understood the phrase "to get money or something valuable" to be an equivalent or substitute phrase for the previous phrase "to commit extortion," not an alternative theory of liability for aggravated kidnapping.

_____

[24] Harper claims the prosecutor relied on the challenged jury instruction to argue he could be guilty of the fourth type of aggravated kidnapping while omitting the requirement that money be extracted from another person. We disagree with Harper's characterization of the prosecutor's closing argument. The prosecutor argued only that Harper committed kidnapping for extortion. She never suggested Harper could be found guilty of counts 10 and 12 absent proof beyond a reasonable doubt that he seized and held Doe 2 *to commit extortion*. Likewise, defense counsel discussed only kidnapping for extortion because that was the sole type of aggravated kidnapping at issue.

Given the evidence presented at trial and the arguments made by counsel, the jury would not have interpreted the challenged instruction as describing two different theories of liability for aggravated kidnapping, one of which was never mentioned at trial.  As the Attorney General observes, "Such an interpretation would be nonsensical in the context of this case."  We conclude there is no reasonable likelihood the jury applied the challenged instruction in an impermissible manner (*Gomez*, *supra*, 6 Cal.5th at p. 313), and, consequently, we reject Harper's argument that his convictions of kidnapping for extortion must be reversed because the jury instruction given included an incorrect statement of law.  Stated differently, we are satisfied beyond a reasonable doubt that the challenged instruction did not contribute to the jury's verdict on counts 10 and 12.  (See *ibid*., citing *People v. Wilson* (2008) 44 Cal.4th 758, 803–804; *Wilson* at p. 804 [finding technical error in written instructions harmless beyond a reasonable doubt].)

D.     *Sufficiency of the Evidence of the Second Kidnapping (Counts 12 and 21)*

Count 12 (kidnapping for extortion) and count 21 (kidnapping) were based on Doe 2's account of Harper taking her from a drug house on Peppertree Court in Antioch.  Doe 2 later escaped from Harper at a gas station with the help of an acquaintance named Johnny.  This was the second kidnapping by Harper that Doe 2 testified about.[25]

On appeal, Harper argues there was insufficient evidence to support these counts, first, because the prosecutor misdescribed the evidence in her closing argument and, second, because there was simply insufficient evidence that Harper kidnapped Doe 2 from Peppertree Court.  We consider these arguments in reverse order.

1.     Evidence of the Second Kidnapping

After Doe 2 testified about the first kidnapping, Doe 2 mentioned there were six other times Harper attempted to kidnap her.  The prosecutor then asked, "And was there another time that he was successful in kidnapping you again?"  Doe 2 said yes and

---

[25] In the first kidnapping (counts 10 and 20), Harper pulled up in a white pickup truck and grabbed Doe 2 off the street in Antioch.  He put something hard to her back, and Doe 2 saw that he had a gun.  Harper took her to the Jack London house and raped her.

26

continued, "I was at this drug house that is on—Peppertree Court. And I was there getting high or whatever. And he showed up. And I didn't—I didn't feel safe there and I didn't feel like anybody would even try to protect me there. So I didn't want anybody getting hurt. [¶] He came in there so I went with him. And that's—that's when he brought up again that he was going to sell me to the man from Vallejo . . . ."

Doe 2 testified that Harper drove her to a location for an act of prostitution. Chop was there, too, and he took a hundred dollars from the prostitution client. Doe 2 was not sure if the client handed Chop a "fake hundred or if Chop switched it out with the fake hundred," but Chop gave a counterfeit hundred dollar bill to Harper. Harper was angry that the bill was counterfeit. He drove to a gas station and asked Doe 2 to get change for the counterfeit bill from somebody. Doe 2 was wearing a "skimpy skirt" and heels, and she was dressed this way "Because [Harper] was going to sell me."

Doe 2 testified she saw Johnny at the gas station. She told him that Harper was trying to sell her to a man in Vallejo and asked for help. Johnny told her, "Jump in the car and don't mess up my speaker," and Doe 2 got in the back of his Bronco. Doe 2 was wearing a coat with a hood and she put the hood up and covered herself with a wet, greasy towel. She testified that Harper and Chop looked around the gas station for her. Harper asked Johnny if he'd seen "a little girl about this height," and Johnny said no and turned up the music playing in his car. Harper looked in the tinted window of Johnny's car. Johnny drove away and then Doe 2 went "[b]ack to Bruce's house." (Doe 2 had gone to his house after the first time Harper kidnapped her.)

In cross-examination, Doe 2 further testified, "So you have the gas station incident occurred [*sic*[26]], I was at the house on Peppertree Court. And he showed up there. With the previous—knowing that he carries a gun and things like that in the previous traumas, he came in the house and was looking for me and I went with him. I didn't want anybody to get hurt. And then he said that he had a date and that's when Chop was there as well

---

[26] This is how the reporter's transcript reads. It seems likely that Doe 2 said, "So *after* the gas station incident occurred . . . ."

27

and the Mexican man came." (Apparently, the Mexican man was the person who paid for a sex act with Doe 2.) Doe 2 also testified that this incident occurred after the first kidnapping.

### 2. Sufficiency of the Evidence

Harper argues Doe 2's testimony was insufficient to support counts 12 (aggravated kidnapping for extortion) and 21 (simple kidnapping) because she did not expressly testify that Harper "did or said anything that could be characterized as seizing, confining, inveigling, enticing, decoying, abducting concealing, or carrying her away" and she "did not testify that he used force or instilled fear in her to compel her to come with him, or that he ordered her to go with him."[27] He claims the evidence here established only that he showed up at the drug house and nothing more. We disagree. Even without express testimony that Harper ordered or forced Doe 2 to go with him, there was sufficient evidence to support counts 12 and 21.

" 'When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] Our review must 'presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' [Citation.] . . . [O]ur task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ' "be reasonably reconciled with the defendant's innocence." ' [Citations.] The relevant inquiry is whether, in light of all the evidence, a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*Gomez*, *supra*, 6 Cal.5th at p. 278.)

---

[27] Recall that aggravated kidnapping under section 209(a) requires the defendant to "seize[], confine[], inveigle[], entice[], decoy[], abduct[], conceal[], kidnap[] or carr[y] away" the victim and simple kidnapping under section 207 requires the defendant to use force or "any other means of instilling fear" to "steal[] or take[], or hold[], detain[], or arrest[]" the victim (§ 207, subd. (a)).

For kidnapping under section 207, "[t]he requisite force or compulsion need not consist of the use of actual physical force or of express threats; the taking is forcible where it is accomplished through the giving of orders which the victim feels compelled to obey because he fears harm or injury from the accused, and his apprehension is not unreasonable under the circumstances." (*People v. Dagampat* (1959) 167 Cal.App.2d 492, 495 (*Dagampat*).) Further, "[e]ven if the victim's initial cooperation is obtained without force or the threat of force, kidnaping occurs if the accused ' "subsequently restrains his victim's liberty by force and compels the victim to accompany him further." ' " (*People v. Alcala* (1984) 36 Cal.3d 604, 622 (*Alcala*)), abrogated by statute on another ground, as recognized in *People v. Hovarter* (2008) 44 Cal.4th 983, 1017, fn. 14.)

*Alcala* demonstrates that circumstantial evidence can be sufficient evidence of the element of force or fear necessary for simple kidnapping. In that case, defendant Alcala was found guilty of murder and kidnapping after the remains of the 12-year-old victim were found in a remote area. Evidence showed that on the day the victim went missing, Alcala approached the victim and her friend at the beach and took their pictures with their permission. Alcala walked or ran away quickly when an adult acquaintance approached. The victim and her friend went to the friend's apartment, the victim then left by bicycle to go to her ballet lesson, but the victim never arrived at her scheduled lesson. (*Alcala*, *supra*, 36 Cal.3d at pp. 613–616.) A forest service worker also testified that she saw a man and a small girl with their backs to her on the evening the victim disappeared. The man appeared to be forcefully steering the girl up the gully. This sighting occurred near where the victim's remains were later found. (*Id*. at p. 616.)

On appeal, Alcala argued there was no proof of force or fear to support the kidnapping conviction, but our high court rejected this argument. Citing evidence that the victim "was a responsible child, highly motivated to meet her late-afternoon ballet appointment," the forest worker's "claim[] to have seen her in defendant's company at the scheduled time, some 40 miles distant from both her home and the dance studio," the fact that Alcala was a virtual stranger to the victim, and a witness's testimony that the

victim found Alcala "strange," the court concluded, "The jury could reasonably infer that [the victim] had not accompanied him voluntarily." (*Alcala*, *supra*, 36 Cal.3d at p. 622.)

*Dagampat* is also instructive. There, kidnap victim Stanley witnessed Contreras stab a person. A few days later, Stanley was outside walking when three boys in a convertible pulled up to him and stopped. Defendant Dagampat was the driver, Contreras sat in the back seat, and a third boy, Valencia, got out of the car and went to a drug store. Dagampat told Stanley, " 'Get into the car. I want to talk to you about the fight.' " (*Dagampat*, *supra*, 167 Cal.App.2d at p. 493.) Contreras and Dagampat gave Stanley a dirty look, and Valencia approached Stanley from behind. Stanley testified that he went with the boys because he was scared, although they displayed no weapons and made no threats. After Stanley got in the car, Contreras asked if he had witnessed the stabbing. When Stanley said yes, Contreras and Valencia started hitting him. The car stopped in an alley, and the boys continued to beat Stanley until he was able to run away. (*Ibid*.) Stanley admitted he did not ask to be let out of the car and did not attempt to leave the car or call for help. (*Id*. at p. 494.)

The Court of Appeal held the evidence and reasonable inferences "amply established a forcible taking." (*Dagampat*, *supra*, 167 Cal.App.2d at p. 495.) The court explained, "It is contended that Stanley had no reason for fear except the 'dirty looks' he observed and that these could not reasonably induce fear of harm. But there was much more for Stanley to think about. He was outnumbered and with one of the group behind him. He was faced by another who was a knife carrier and who might have a knife in his belt. They wished to talk with him as a supposed witness to a fight. It is difficult for us to see how it was unreasonable for Stanley to fear harm that might come from his refusal to enter the car in view of the fact that he was assaulted soon after entering it." (*Ibid*.)

Here, Doe 2 had seen Harper and his associates jump Chavez, which "put some fear" in her. She was with Harper when he grabbed Doe 5 off the street and made her sign a contract that she owed him money. Harper had made a woman cut Doe 2's hair while he recorded the incident. More importantly, by the time he showed up at the drug house, Harper had already raped Doe 2 more than once, he had already kidnapped her,

30

and Doe 2 had seen him with a gun on more than one occasion. Doe 2 testified she went with Harper from the drug house because she "didn't want anybody getting hurt" and Harper mentioned "again that he was going to sell [her] to the man from Vallejo." This was evidence from which the jury could infer that Doe 2 did not go with Harper voluntarily and therefore Harper must have used force or fear to induce her to accompany him. (See *Alcala*, *supra*, 36 Cal.3d at p. 622.) Evidence that Harper expressly threatened Doe 2 was not required to establish the use of force or fear given what Harper had done to Doe 2 and others previously. (See *Dagampat*, *supra*, 167 Cal.App.2d at p. 495.)

       3.     The Prosecutor's Closing Argument

Harper also argues counts 12 and 21 must be reversed because the incidents the prosecutor relied on to support those counts "did not occur." His argument is based on the prosecutor's closing argument, in which she gave a garbled recounting of the second kidnapping testified to by Doe 2. Even so, the prosecutor's misdescription of some of the facts of the second kidnapping does not warrant reversal of Harper's convictions.

The prosecutor discussed the evidence supporting counts 12 and 21 in her closing argument as follows: "In your next set of crimes will be the second kidnapping of (*Jane Doe 2) off the streets. Again, we have the kidnapping for extortion and the kidnapping itself. The [*sic*] Derrick Harper seizing her with the intent that she be basically forced to give him money from prostitution again and that he moves her.

"And with regard to those counts (*Jane Doe 2) testified to you that she was by the bingo hall in Antioch in the FoodMaxx parking lot. That Mr. Harper pulled up in the gold Lexus with his hands on his lap, got out, ordered her into the car. He took her back to the Jack London house and that the following day he had her dress in high heels and short skirt and took her into Brentwood. There was a forced act of prostitution there.

"And then there was the exchange with Chop with counterfeit hundred dollars [*sic*] bill and with Mr. Harper telling (*Jane Doe 2) to get change for that hundred dollar bill at the gas station. When she seen [*sic*] Johnny, one of the [W]oods, if you will, one of the white boys and she hides under the greasy towels in the back of his truck to escape. So that's our second kidnapping for extortion and kidnapping."

31

But Doe 2 never mentioned a bingo hall, a FoodMaxx parking lot, or a gold Lexus when she testified about the second kidnapping. She did not testify that Harper ordered her into his car or took her back to the Jack London house. Nor did Doe 2 testify that Harper took her to Brentwood.[28]

Nevertheless, the kidnapping events to which the prosecutor was referring would have been clear to the jury. The prosecutor correctly identified the salient details that Doe 2 was dressed in "high heels and short skirt" (Doe 2 testified she was wearing heels and a "skimpy skirt"), that Doe 2 was forced to commit an act of prostitution, that there was an exchange with Chop involving a counterfeit hundred dollar bill, that Harper took her to a gas station to get change, and that Doe 2 escaped from the gas station with Johnny by hiding under a greasy towel in the back of his truck (Doe 2 testified she "covered [herself] with a wet, greasy towel that was back there").[29]

We also note that in cross-examination of Doe 2, defense counsel referred to the second kidnapping as the "gas station" incident and asked whether it occurred after the

---

[28] In our review of Doe 2's testimony, we found no mention of a bingo hall or FoodMaxx parking lot. Doe 2 did testify that Harper drove a Lexus, but that came up when she was describing the time he and his associates jumped Chavez. It was in the first kidnapping incident, not the second one, that Harper told her to get in his truck and took her to the Jack London house. Witness Hammond, not Doe 2, testified that Harper drove up in a gold Lexus with a gun on his lap and told her to get in his car. Hammond mentioned seeing Harper at a bingo hall. Doe 2 testified that Gordon, not Harper, took her to a "date" (i.e., act of prostitution) in Brentwood.

[29] Harper points out that the prosecutor described Johnny as "one of the [W]oods," and he argues there was no evidence of this. But there was evidence from which it could be inferred the man who helped Doe 2 get away from Harper at the gas station was associated with the Woods. Doe 2 testified she was hanging out with a White criminal street gang, the CoCo Country Boys (also referred to as Peckerwoods or Woods), because she thought they would protect her from Harper to some extent. During cross-examination, defense counsel asked about houses associated with the CoCo Country Boys, and Doe 2 responded, "Bruce's house. Johnny's house." Given that Johnny helped Doe 2 escape from Harper, it could be inferred this was the same Johnny whose house was associated with the CoCo Country Boys, the gang from whom Doe 2 sought protection from Harper.

Jack London incident (the first kidnapping). Doe 2 adopted defense counsel's nomenclature and testified the "gas station incident" was when she "was at the house on Peppertree Court." Thus, when the prosecutor described the second kidnapping as relating to the events at the gas station, the jury would have recognized this was the kidnapping that began at the drug house on Peppertree Court.[30]

Moreover, "the prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury." (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.) We have already concluded there was sufficient evidence to support counts 12 and 21. Our conclusion does not change merely because the prosecutor's description of the evidence was off in some of the details.

For his contrary argument, Harper relies on *People v. Brown* (2017) 11 Cal.App.5th 332, 341 (*Brown*), in which the Court of Appeal recognized " 'if one criminal act is charged, but the evidence tends to show the commission of more than one such act, "either the prosecution must elect the specific act relied upon to prove the charge to the jury, or the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act." ' " The purpose of this rule is to protect the constitutional right to a unanimous jury. (*Ibid.*)

The *Brown* court further held, "when the prosecution has made an election, under circumstances where a unanimity instruction would otherwise have been required, then we, too, are bound by that election. Thus, if the defendant raises a substantial evidence challenge, our review is limited to whether there is sufficient evidence to support a conviction based exclusively on the act elected by the prosecution. [Citation.] Otherwise, we may only be finding sufficient evidence to support a nonunanimous verdict." (*Brown*, *supra*, 11 Cal.App.5th at pp. 341–342.)

---

[30] And one of the jury's questions during deliberations further shows it understood the second kidnapping involved the drug house on Peppertree Court. The jury sent a note asking the court reporter to read Doe 2's testimony about count 12 "From the Peppercorn Drughouse." Given Doe 2's testimony, the jury's question could only have referred to the kidnapping from the drug house at Peppertree Court.

In *Brown*, evidence was presented of two potential rapes by defendant Brown, one rape was committed by four men in a bedroom and a second rape may have occurred in a vacant apartment after the victim passed out; Brown was found guilty of rape in concert and forcible rape, among other offenses. (*Brown*, *supra*, 11 Cal.App.5th at pp. 334, 336–337.) The Court of Appeal found there was sufficient evidence that force was used in connection with the rapes in the bedroom to support the rape in concert and forcible rape convictions (and there was sufficient evidence Brown was one of the four men who committed those rapes), but there was not sufficient evidence of the use of force or fear in connection with the rape in the vacant apartment. (*Id.* at pp. 339–340.)

At trial, however, the prosecutor in closing argument posited *only* that Brown arrived after the rapes in the bedroom (so he was not one of the four men who committed those rapes) and that he took the victim to the vacant apartment and raped her there. (*Brown*, *supra*, 11 Cal.App.5th at p. 340.) The *Brown* court reasoned, "In closing argument, the prosecutor elected to rely solely on a rape in the vacant apartment. . . . As a result of that election, . . . in reviewing the sufficiency of the evidence of force, we are limited to considering a rape in the vacant apartment." (*Id.* at p. 342.) The court reversed Brown's convictions of rape in concert and forcible rape because there was insufficient evidence to support those convictions in connection with the rape in the vacant apartment, the incident the prosecutor elected to rely on. (*Ibid.*)

We fail to see how *Brown* applies in this case. Here, the evidence showed two kidnappings, and Harper was charged with both. The purpose of the *Brown* rule is to ensure a unanimous verdict. But there is no risk that the jury came to a nonunanimous verdict here because the jury found Harper guilty of both sets of kidnapping charges.[31]

---

[31] To be clear, we do not believe there is any likelihood that the jury was confused about which kidnapping evidence was connected with which counts. The prosecutor in her closing argument correctly described the evidence supporting the first kidnapping, recounting that Harper approached Doe 2 in a white truck when she was walking in Antioch at night, that he put something hard to her back and told her to get in the truck, that he took her to the Jack London house and raped her, and that Doe 2 escaped by hopping a back fence. The jury would not have been confused about which evidence was

34

E.      *Firearm Enhancement*

The jury found true the enhancement allegation that Harper personally used a handgun in the commission of count 12 (the second kidnapping for extortion), pursuant to section 12022.53, subdivision (b).  The Attorney General concedes this finding must be reversed for lack of evidence.  We accept the concession because Doe 2 did not testify that Harper used a gun when he took her from the drug house on Peppertree Court and later had her dress in a skimpy skirt and heels for an act of prostitution.  The true finding on the firearm enhancement allegation for count 12 is reversed, and the 10-year enhancement the trial court imposed under section 12022.53 is stricken.[32]  Although the trial court announced at sentencing that it was imposing a 10-year enhancement under section 12022.53 as to count 12, the minute order and abstract of judgment inaccurately show that the firearm enhancement is tied to count 15.  Since we are remanding the case for resentencing (see below), we simply note that *no* 10-year enhancement under section 12022.53 may be imposed at resentencing.

F.      *Senate Bill 1393*

The trial court sentenced Harper in August 2017.  "Prior to 2019, trial courts had no authority to strike a serious felony prior that is used to impose a five-year enhancement under section 667, subdivision (a)(1)."  (*People v. Jones* (2019) 32

connected with the first kidnapping (counts 10 and 20) and which evidence was connected with the second kidnapping (counts 12 and 21).  (And see fn. 30.)  But even assuming for the sake of argument that some of the jurors were confused on this issue, Harper still received unanimous verdicts because the jury found him guilty of *both* sets of kidnappings.  It would not matter if some of the jurors mistakenly thought the drug house on Peppertree Court/gas station incident was the first kidnapping and the kidnapping involving a white truck and the Jack London house was the second kidnapping because those jurors still found him guilty of both sets of crimes.

[32] Harper argues in the alternative that we should remand the case for resentencing under Senate Bill No. 620 (2017–2018 Reg. Sess.) (Stats. 2017, ch. 682), which "vests sentencing courts with discretion to strike or dismiss firearm enhancements" (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 423).  Because we are reversing the only firearm enhancement imposed in this case, this argument is moot.

Cal.App.5th 267, 272.) Senate Bill No. 1393 (2017–2018 Reg. Sess.) (S.B. 1393), which became effective January 1, 2019, granted trial courts such authority. (*Ibid.*; Stats. 2018, ch. 1013, §§ 1, 2.)

Harper seeks remand for the trial court to exercise its newly-authorized discretion under S.B. 1393. The Attorney General agrees the new sentencing law applies retroactively to Harper, but he argues remand is not necessary in this case because the record shows that remand would be futile. In an abundance of caution, however, we will remand for resentencing. (See *People v. McDaniels, supra,* 22 Cal.App.5th at pp. 428-429 ["nothing in the record rules out the possibility that the court would exercise its discretion" to strike an enhancement that was mandatory at the time of sentencing].) We express no opinion on how the court should exercise its discretion on remand.

G.  *Five-year Enhancements for Human Trafficking Offenses*

The trial court imposed an additional 10 years (two five-year terms) for prior serious felonies for count 1 (conspiracy to commit human trafficking) and for count 15 (human trafficking of Doe 1). The parties agree that these enhancements must be stricken because human trafficking is not a "serious felony" for purposes of section 667, subdivision (a)(1), which provides for the five-year enhancements. A "serious felony" under section 667 means a serious felony listed in section 1192.7, subdivision (c) (§ 667, subd. (a)(4)), but human trafficking and conspiracy to commit human trafficking are not on the list of serious felonies (§ 1192.7, subd. (c)). Accordingly, the two five-year enhancements under section 667 imposed for count 1 and the two five-year enhancements under section 667 imposed for count 15 are stricken.

H.  *Corrections to the Record*

Finally, we decline to order various corrections to the clerk's minutes and abstract of judgment requested by Harper. We see no reason to order the court to correct the current abstract of judgment given that we are remanding for resentencing. When Harper is resentenced under S.B. 1393 on remand, no firearm enhancement under section 12022.53 will be imposed because we are reversing the finding of personal use of a firearm. Thus, it does not matter that the current abstract of judgment inaccurately

36

reflects that the enhancement is attached to count 15 rather than count 12. And, while we agree with Harper that the clerk's minutes should accurately reflect the sentence pronounced by the court, it strikes us as a waste of judicial resources to order the clerk to correct the minutes of the August 2017 sentencing when Harper is going to be resentenced.

## DISPOSITION

The true finding on the firearm enhancement allegation for count 12 is reversed.[33] The 10-year enhancement imposed under section 12022.53 is stricken. The enhancements for prior serious felonies are stricken as to count 1 (conspiracy to commit human trafficking) and count 15 (human trafficking). The matter is remanded for resentencing pursuant to sections 667, subdivision (a), and 1385, subdivision (b), as amended by S.B. 1393. The judgment is otherwise affirmed.

---

[33] We again note that the abstract of judgment filed November 3, 2017, incorrectly reflects that the firearm enhancement was attached to count 15. To be clear, the *only* firearm enhancement in this case was attached to count 12, and we are reversing it. The jury did *not* find a firearm enhancement for count 15. When Harper is resentenced, there should be no firearm enhancement attached to any count.

_____
Miller, J.

We concur:

_____
Richman, Acting P.J.

_____
Stewart, J.

A152284, *People v. Harper*

Trial Court:  Superior Court of Contra Costa County


Trial Judge:  Hon. Charles B. Burch


Victoria H. Stafford, under appointment by the Court of Appeal, for Defendant and Appellant


Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Laurence K. Sullivan and Moona Nandi, Deputy Attorneys General, for Plaintiff and Respondent


A152284, *People v. Harper*